UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION


UNITED STATES OF AMERICA, )
)
            Petitioner, )
)
            V. ) 5:08-hc-02095-BO
)
JOSEPH AARON EDWARDS, )
)
            Respondent.)
)
_____)


MOTION HEARING
APRIL 7, 2011
BEFORE THE HONORABLE TERRENCE W. BOYLE
U. S. DISTRICT JUDGE


**APPEARANCES:**
**FOR THE GOVERNMENT:**

G. NORMAN ACKER, III
JOSHUA B. ROYSTER
U.S. ATTORNEY'S OFFICE
310 NEW BERN AVENUE
ROOM 800
RALEIGH, NORTH CAROLINA 27601


**FOR THE RESPONDENT:**

JANE E. PEARCE
SUZANNE LITTLE
FEDERAL PUBLIC DEFENDER
150 FAYETTEVILLE STREET MALL
SUITE 450
RALEIGH, NORTH CAROLINA 27601


COURT REPORTER: REBECCA L. CRUNK
STENOTYPE WITH COMPUTER AIDED TRANSCRIPTION

```
1                          * * * * * * * *

2         (The proceedings began at 1:30.)

3         THE COURT:  We're in session in the Edwards case.  It was

4    set for trial on March 28th, and on the 24th, which I believe is

5    a Thursday, I think that's the right date, the Government

6    dismissed it, and I signed the order either on the 24th or -5th.

7    Isn't all that true?

8         MS. PEARCE:  Yes, your Honor.

9         THE COURT:  Okay.  And you made mention at the hearing on

10   the 28th that there was a report that you believed that you had.

11   I interpreted it to mean you had the report that had been done

12   either in October or September, if I got it right, that was

13   favorable to the detainee but not disclosed to until some later

14   time.

15        MS. PEARCE:  I believe it was disclosed on that Wednesday,

16   and I have the report --

17        THE COURT:  Well, just hold on to it and let me go through

18   this dialogue.  And so Wednesday would have been the 23rd, and

19   that's when you got -- and then the 24th the case was dismissed.

20        MS. PEARCE:  Yes.

21        THE COURT:  And the report was by a psychiatrist?

22        MS. PEARCE:  A Bureau of Prison psychologist.

23        THE COURT:  Psychologist.  And the report would have been

24   favorable to Edwards in terms of his not being found to be

25   sexually dangerous or suffering from a major medical disorder.
```

1          MS. PEARCE:  Yes.  If I may quote that Dr. Demby opines

2     that Mr. Edwards does not meet criteria as a sexually dangerous

3     person as defined of under 18 U.S.C. 4248.

4          THE COURT:  And what's the date of that report?

5          MS. PEARCE:  September 22nd, 2010.

6          THE COURT:  Have you made any discovery requests or

7     requests for the production of favorable material?

8          MS. PEARCE:  I believe we had issued a general discovery

9     request, and I would have expected this to be a part of that

10    discovery.  I believe the Government's discovery deadline was in

11    early October, and that's why this was a little unsettling to

12    have it not materialize until March.

13         THE COURT:  Right.  If this had been a criminal case and

14    you had made a Brady request, that would have been Brady

15    material, and it would have been subject to disclosure by the

16    Government to the defendant whenever the request was made; isn't

17    that correct?

18         MS. PEARCE:  Yes, your Honor.

19         THE COURT:  All right.  And that's what I'm struggling with

20    is to what extent the principles of Brady bleed into 4248 where

21    the Government is acting in a custodial setting and liberty is

22    involved, and the Government is prosecuting the case with the

23    burden of proof, and the Government has evidence that it

24    receives either by creating it or recovering it during the

25    process that tends to exonerate or support release of the person

1  whether the Court ought to fashion a rule that upon request, the
2  Government has to provide that because in the civil context, the
3  Government can invite a lot of inquiry, do as many analysis or
4  opinions as it wants and only cherry pick the ones that fit if
5  there's no compulsory disclosure requirement.

6  MS. PEARCE:  You know, your Honor, I'm on shaky ground when
7  it comes to civil process, I will admit, but I thought if a
8  report were prepared under the civil rules, it should have been
9  produced, but I would defer to --

10  THE COURT:  Well, I don't know if it had to be produced if
11  you didn't ask for it.

12  MR. ACKER:  Actually, your Honor, it did.

13  THE COURT:  Okay.

14  MR. ACKER:  The standing order requires -- has a list of
15  things that we are required to produce whether they're asked for
16  or not, and I don't believe there was a discovery request, but
17  we had the obligation to provide it under the standing order,
18  and the standing order is very specific about what we have to
19  provide, and it includes all medical and psychological record in
20  possession of the Bureau of Prisons of the Government, the
21  section offenders aid in the records in the possession of the
22  BOP of the Government, the central file for the respondent, the
23  JNC file for the BOP file and all documents reviewed by the
24  examiners designated by the Government or any other expert
25  identified by the Government as well as any other documents

1  under the general civil rules for initial disclosures.

2      So, your Honor, if we had, in one of those categories,

3  information whether it's helpful to us or helpful to them, we

4  have the obligation to turn it over.  The reason it didn't

5  happen in this particular case, your Honor, was that, as your

6  Honor knows, these documents are voluminous and so it takes a

7  little bit of time for the Bureau of Prisons to scan all these

8  documents electronically, they then deliver a disk of those

9  documents to the U.S. Attorney's office.  We then electronically

10 Bates stamp those documents and provide them to the respondent's

11 attorney.

12     In this case the documents from the Bureau of Prisons were

13 delivered to us on -- from the Bureau of Prisons to the U.S.

14 Attorney's office on September 9th.  We began processing them on

15 September 10th, and we produced them to the respondent on

16 October 4th.

17     THE COURT:  But you didn't produce this report.

18     MR. ACKER:  We did not, your Honor, because what happened

19 was this report was produced after the Bureau of Prisons gave us

20 the documents to process --

21     THE COURT:  Right.

22     MR. ACKER:  -- and before we produced the initial

23 disclosure.  So we didn't know about it, and as soon as we found

24 out -- we found out about it because we also have the obligation

25 to supplement our disclosures, and so in preparation for

1  trial --

2       THE COURT:  Yes.

3       MR. ACKER:  -- we went out to look to see if anything had

4  been added --

5       THE COURT:  Right.

6       MR. ACKER:  -- and in fact we discovered that this had been

7  added.

8       THE COURT:  Well, I have no -- I have no particular

9  insight, but correct me if I'm wrong, and I'm not being

10 accusatory at all, but had this been a case assigned to a

11 different judge who was not -- who had not set it for trial on

12 March 28th, the information might not have been discovered.  It

13 might have been accidentally or it might not have been.  It was

14 the preparation for trial that triggered a more careful

15 examination and the discovery of this information and the

16 release of it.

17      MR. ACKER:  That is true, your Honor.

18      THE COURT:  Okay.  So that's something that we obviously --

19 it creates a profound problem for the Court and for the lawyers

20 who were involved here.  Again, I'm not throwing any stones.

21 I'm not trying to assign any responsibility at all, but, you

22 know, the Public Defender and the Comstock experience, some of

23 these people were started in the fall of '06 and then '07 and

24 '08, and none of them have been tried, none, zero have been

25 tried.

So if it's the bringing them into a courtroom in front of a
District Judge and calling the case for trial that will only
result in the disclosure of exculpatory material, then they all
should have been set for trial sometime in December of 2006, and
I think that some of the criticism that's coming from the
appellant court now is that you didn't do this, and nobody --
everybody sat on their rights hoping that it will go away, and
it didn't go away.

And so there are people who are -- I almost -- I sound
preachy. I'm not trying to be preachy. These are just facts.
There are people who have been in jail two, three, four years
who were, like -- were released.

Let me keep going because, you know, I've got all these
things that are relevant to case. I brought Edwards in here the
first time. He's an Apache Indian. He comes off a reservation.
We brought him in here. We know in our preparation for an order
what the date was, but it was sometime earlier in time. He
didn't have an interpreter so we had to bring him back. We got
the interpreter from the Apaches who came, and then it turns out
he didn't need the interpreter.

And so he had several schedulings that brought him current
into this room and none of those produced an examination of the
record that would have given up this information upon which,
apparently, you acted and let him go to supervised release.

And this is exactly what Broncho was about. I mean, the

1  heart of the ruling in Broncho is that this is the way you

2  should be doing it, but it's not going to happen because you're

3  just get remanded it, and it's going to get lost in the shuffle.

4      And hold on.  I'll collect my thoughts.  Oh, yeah, the

5  thing that is unspoken and unresolved is apparently he was

6  certified.  He had to be certified, and I've read Edwards'

7  certification and on that showing, he's detained.  He doesn't

8  participate in anything.  There's nothing that he does to alter

9  the condition that he's in through these years in the BOP, and

10  now he's okay, and I think that's a matter of some concern how

11  he could be certified, unchanged and now the Government's

12  position is, no, he's capable of being released into society

13  with supervised release.  And his supervised release terms

14  haven't changed.  They're whatever he had coming out of the

15  criminal process.  That's the point I'm trying to make in

16  Broncho, you know, that you have a criminal judgment that's

17  entitled to dignity and enforcement, and now the Government

18  says, yeah, that's right with Edwards even though for however

19  many years, we didn't agree with that.

20      Nobody cares and nobody looks.  There's no ACLU jammed in

21  this room.  The News and Observer and the ABC news aren't here.

22  Nobody cares.  But the Government's got a serious obligation

23  here, I mean, both ways, to keep dangerous people off the

24  streets, and that's a valid legitimate mandate, but not to keep

25  people off the streets in an architectonical kind of thing where

1  they're just dropped out of society for years until somebody

2  sets it for trial.

3       MR. ACKER:  Your Honor, there are three things that the

4  Government has done to try to address the concerns that -- the

5  valid concerns your Honor has raised.  One is to try to make

6  sure that the specific instance in Edwards doesn't happen again

7  as we have gone back out to the Bureau of Prisons and tried to

8  reinforce with the psychologists out there that if they issue

9  another opinion, that they need to give that to us, and they

10  need to give that to us immediately so that that won't happen

11  again.

12       The second thing is that your Honor is not -- the other

13  time that we look for exactly this sort of situation, either

14  information that we didn't have or change of opinions by the

15  psychologists or whatever, we are looking at that again as each

16  case comes up for review.  And it's not when it's set for trial.

17  It's earlier than that as each time that we are producing the

18  reports to the other side.

19       THE COURT:  I know that you dropped two people this week,

20  one of Judge Dever's, one of Judge Flanagan's I think.  You

21  dropped another one of mine earlier in time, so counting

22  Edwards, that's four that I know about recently, and then Judge

23  Dever had one dropped earlier, that's five.

24       So I know of at least five who no change having taken

25  place, they're not in therapy, they're not proactively trying to

respond, who you later said the certification was not defensible
and you let the petition -- you let them go under supervised
release so the certification couldn't be defensible otherwise
you should stick to it.

MR. ACKER:  Well, your Honor, I think that there are issues
of prosecutorial discretion that we're using as well.  That
doesn't mean it's not necessarily not defensible, but that may
be a close case that we decide that the conditions for --

THE COURT:  No.  I can't agree that that's the kind of --
it's not like you, as a prosecutor, can round up people, hold
them in a pen and then over time decide which ones to bring
forward with criminal charges, and that's what's happening here
because there's no front end scrutiny by the Court.

MR. ACKER:  Well, that's true.  There's not a scrutiny by
the Court.

The other thing that's happened, your Honor, is that since
the time that some of these respondents were certified, the
science continues to develop and there was a change --

THE COURT:  But the law doesn't say -- the law doesn't say
you can round -- you can detain everybody who the science now is
sustats (ph), but if the science changes, no due process
involved, just let them go.

MR. ACKER:  No, your Honor, but if the opinion originally
was that they met the criteria and upon re-evaluation, they
don't --

1    THE COURT:  Well, would you be willing to agree that the

2  Adam Walsh Act is unconstitutional for Vegas now?

3    MR. ACKER:  No, your Honor.

4    THE COURT:  Well, isn't that about what you just said?

5    MR. ACKER:  No, your Honor.

6    THE COURT:  If the science is migrating and the science is

7  imprecise, it would be like saying, you cannot steal, but you

8  can borrow, but sometimes if you keep it too long after you

9  borrow it, that's really stealing so, you know, we'll have to

10  worry about the crime after the fact.  You know, that's what it

11  sounds like.

12    MR. ACKER:  That certainly is not what I intended to say.

13    THE COURT:  Well, I know, but a critical mind might say,

14  wow, vagueness.  You know, you can't have a crime or a detention

15  that so -- a law that's so vague that no one knows what it

16  means.  So if you can't tell because the science is yet in

17  development who is certified and who is not certified, huh,

18  seems like that's a little unconstitutional.  And no one's ruled

19  on that yet because no one's been able to penetrate through into

20  the science.  We're still enveloped in the procedures of the

21  science laying back there as the big dragons in the back.

22    MR. ACKER:  Well, your Honor, there have been others that

23  dealt with science and numerous --

24    THE COURT:  On 4248?

25    MR. ACKER:  The numerous science that have dealt with the

science in the State courts, and there have been several courts,

one in Hawaii, one in Iowa and several cases in Massachusetts in

Federal Court dealing with 4248, yes, your Honor, and there's

been at least one that I know of amended in Massachusetts under

4248.

So the science -- and those were, like, two-week trials,

your Honor, where the science was highly contested, but the

Court ultimately found that, yes, in some instances -- which is

to be expected, in some instances, the Government was able to

meet its burden, and some instances the Government was not able

to meet its burden which would happen in any -- in criminal

cases, in civil cases.  And -- but the fact that the Government

uses good faith is re-examining some of these and deciding that

we should in fact release them.

THE COURT:  Yeah.  But the problem that I think that is

embedded in this is that you're never in front of a judge.  You

don't have these people in front of a judge with having to

defend the position that you're in at that time.

MR. ACKER:  I understand, your Honor.  And all I can say is

Congress didn't write the law that way, and that's what we're

stuck with.

THE COURT:  That's true.

MR. ACKER:  But we have made every effort to try --

THE COURT:  I cut you off.  I want you to be entitled to

finish what you were saying about your compliance.

 1      MR. ACKER:  The first is that we've made sure that we've

 2  spoken to the psychologists so that they know that if they are

 3  providing a report to give it to us immediately so that we can

 4  deliver it, and any report that is written by the BOP

 5  psychologists, we will turn over.

 6      The second thing we have done is to review these -- not

 7  wait just for trial, but reviewing them as we are producing the

 8  initial disclosures and that has resulted in I don't know how

 9  many, probably six, seven, eight, something like that of the --

10      THE COURT:  Dismissals.

11      MR. ACKER:  -- 95 --

12      THE COURT:  Turned into supervised release.

13      MR. ACKER:  That's correct, your Honor.  Then -- I had one

14  other point, but I've lost my --

15      THE COURT:  That's my fault.

16      MR. ACKER:  But that's the main thing, your Honor, is that

17  we are doing our best to make sure that that does not happen

18  again.

19      I would say, your Honor, I do not think that there is an

20  obligation under Brady.  I don't believe there's a

21  constitutional obligation to turn things over.  The obligation

22  we have is the obligation from the standing order of the Court

23  obligating us to anything that's in the Bureau of Prisons' files

24  we have to turn over.

25      So if there is some exculpatory material in the Bureau of

1    Prisons' files, yes, we have to turn it over, but if we

2    consulted with somebody -- some other expert who says, you know,

3    this something, for whatever reason, we're not obligated to turn

4    that over.  The civil rules make very clear that if we don't

5    designate that person as an expert that we don't have to turn

6    that information over.

7         THE COURT:  Right.  Your position is, and I don't disagree

8    with you at all, that the obligations you have now spring from

9    rules of practice in this court, and they're court generated,

10   not necessarily constitutional or not constitutional at all as

11   you see them.

12        But that leaves unanswered a situation where you might have

13   a variety of opinions and picked those that worked for you and

14   ignore those that don't work for you because you're an advocate,

15   and you've already got a case in progress, and you've certified

16   the person that you want to prevail at the -- at your hearing,

17   and the detainee would never know what the outcome was of the

18   opinions in evidence that he didn't see or didn't even know

19   existed.

20        MR. ACKER:  That's correct, your Honor.

21        THE COURT:  Well, you couldn't do that in a criminal

22   setting.  You couldn't send out a squad of investigators, have

23   some come back and say he did it and some come back and say he

24   didn't do it.

25        MR. ACKER:  That's correct, your Honor.

1    THE COURT:  And then hide the ball and only give you the

2  ones that said he did it.

3    MR. ACKER:  That is absolutely correct.

4    THE COURT:  And that's where I'm going.  I'm not going to

5  pull any punches with you.  I think that constitutionally

6  because of the loss of liberty and the context of this as being

7  either criminal, quasi criminal or as close to criminal as civil

8  can get, whatever you want to call it, that a rule needs to be

9  put in place.  I'm going to do it.  It will only apply in my

10  cases.

11    And do you want to add anything to this case or discussion?

12  You see, I think Edwards is the appropriate case to make a

13  ruling in because it's the one that had the fact problem.

14    MS. PEARCE:  I think you're correct, your Honor.  And I

15  think it would be important certainly for the Government to work

16  very closely with the psychology staff within the Bureau of

17  Prisons to not only forward any formal reports but any notes

18  that are developed especially whenever their internal cutoff

19  dates are because even within those notes I can tell from this

20  case that there occasionally some notes that have detrimental

21  inclination.

22    I think, if I understand the standing order correctly, it

23  defines only an obligation.  Once that certificate is filed, the

24  Government should remain under an ongoing obligation to keep

25  producing.  There should be no internal cutoff when they deliver

1  stuff and how big it is.  It should be continuous.

2      THE COURT:  Well, Mr. Acker, I think you know from your

3  long experience that, correct me if I'm wrong, in the criminal

4  context of Brady, somebody makes a Brady request, the judge

5  doesn't run over to your office and start pulling out papers in

6  your file to see if there's any Brady in there.  You're under a

7  good faith obligation to disclose and many, many, many times, if

8  not for journey's sake, I've looked at everything in my file.

9  You have everything that could be considered Brady and there's

10  nothing else.  And they say, well, we think there is.  And you

11  say, well, there isn't and I certify that and the Court says

12  fine.  The Government certifies it, that's the answer.  Isn't

13  that --

14      MR. ACKER:  Yes, your Honor.  That's my understanding.

15      THE COURT:  And I think that that would be the case here.

16  If you have the obligation, then you comply with it and say I

17  complied with it.

18      MR. ACKER:  And I would agree that we have a continuing

19  obligation.  I think practically, and I think courts have

20  understood this, that, especially in a civil context, that that

21  is a periodic obligation.  We have a periodic obligation to look

22  at such reasonable periods of time in supplement, just as they

23  have an obligation to supplement any information that they have

24  that they are going to give to us.

25      And I did raise that because it did come up in the Edwards'

case that there was information about a witness that they
planned to call to trial.  I think the order said that they're
supposed to disclose that to us as part of their initial
disclosures, and they're supposed to supplement periodically.
And we didn't find out about that witness until we called the
witness to get some documents, and he said, well, I'm bringing
them to trial.  I've been subpoenaed.  And we weren't copied
with the subpoena, we weren't notified.

So I think both sides are working under extreme
circumstances.  We're learning as we go along, doing the best we
can.  I don't think we're connecting in part.  I'm just pointing
out that the obligation to supplement is reciprocal and the
obligation to periodically update disclosures is reciprocal, and
we acknowledge that we didn't do it as quickly as we should have
in the Edwards' case.

THE COURT:  Again, I'm not finger pointing.  I agree with
you that we're all trying to improve and resolve our procedures
and practice in this hearing.

MS. PEARCE:  Likewise, your Honor, if I may, I think if
we'd had this report -- well, there are two issues.  One is, it
really is the very specific procedural history of Mr. Edwards'
case that left to an internal decision to withdraw the motion
for appointment containment because basically we had never
gotten authority -- the original order of appointment did not
authorize Mr. Edwards to seek an independent examiner.  When Mr.

Edwards filed a motion for a hearing, he requested an appointment with an independent expert and following his motion for hearing was granted, the motion for the independent expert was not.

At the end of the day, the January order came out and from a strictly legal perspective, I do not know whether this Court is absolutely bound by the January order, but I do know that it was in Mr. Edwards best interest to go ahead and select an examiner to go through an examination because actually, internally, by the time I got this case, I thought it was thin and needed to rev it up.

We've had these intermittent status conferences, and I did not bring my dates -- the date sequence, but at the status conference in which they -- the Government notified us that it was one, we said we will rely on one examiner at this level, but we did this selection of an independent examiner without the direct authority as anticipated through 18 U.S.C. 4247, and that's why we filed that motion because we had acted without direct order from this Court.

We realize, your Honor, the standing order was in place, but, again, we are, and certainly Mr. Acker, we are finding our way through this process.

And if I can address two housekeeping items that would help and are part of this motion. One is, when you go to file under ECF, there is no option to pick a notice of court examiner, and

I believe the paralegals in our office use a filing cross, and it's wonderful, have been instructed to file the independent reports under as a -- under the nomenclature of the filing of the status book.

As I also alluded to you last time, in my practice of independent experts, and I realize the standing order is unclear, but the way I see it and I believe the way our office sees it is that we would have a right as the respondent's counsel to hire our own expert. We also ask under the statutes for the appointment of an independent expert and that expert in fact can communicate with either side. Now, the standing order is not entirely clear on this, but that's how I operate.

As I said, we went ahead and -- with Dr. Singer, but we realized that we were preparing to defend this, that this was procedurally for us a difficult case if we had not gotten authority from the Court's decision.

THE COURT: Well, I don't know if I'm answering your questions, but the standing order doesn't bind cases in this court. The standing order only provides to those who want to conform to it, and I don't -- I didn't adopt it and so work my way through my own cases. And as far as I'm concerned, you had the authority to hire the expert, and I'm going to allow the payment of it through the court budget not the U.S. Attorneys. I'm going to end up ruling that the payments need to be authorized, the CJA fund, not the Government. The Government's

got it's own obligations and is going to pay for it.  I can't --
that is my cases and maybe beyond, and this is my belief policy
wise that it's better to have that funding go through the CJA
budget rather than go through the executive department.  That's
not what you asked for at the earlier hearing.  I think you
wanted to charge the Government.

MS. PEARSON:  If the moment of practice in the 18 U.S.C.
4241 sequence that the Government pay for the majority of
services provided by the court appointed.  If we are to hire an
expert, we will go through our internal funding, but if we ask
the Court to appoint an independent expert, overruled our only,
quote, control over input is the selection, we are bound by
whatever that expert's opinion is for better or for worse, that
authority that has been presented in our motion would be the
responsibility of DOJ.  And I think we have some strong
arguments why CJA funds should not be used, but at this point,
your Honor, I would have to defer to that order prepared by if
you want to hear from me on that.

THE COURT:  Well, okay.  But it's not just your Public
Defender represented cases, it's family cases, too.

MS. PEARCE:  Exactly.

THE COURT:  So when they have an independent psychiatrist,
they're going to have to seek funds to pay for that person.

MS. PEARCE:  Yes, your Honor.  They need funds and go
through the same mechanism that the Federal office does in this

practice to present the bills to the U.S. Attorney's office for
the independents. And I think what's important to understand,
as of the defense attorneys, we have a choice of hiring our own
expert with FTD funds or CJA panel funds for the panel
attorneys. When we, as panel attorneys, ask the Court under the
authority 23 7B to authorize the appointment of an independent
examiner, traditionally, that has been in past practices, I
believe, under that that DOJ would pay for such examination and
subsequent report.

THE COURT: And you don't want to do that, right? That's
where you're resisting.

MR. ACKER: Yes, sir.

THE COURT: Okay. Again, long story short, I think that
the CJA ought to pay for that, and I agree with the Government
on that. I'm sure that the appellant court would be delighted
to screen that out and make another opinion on it. I don't know
when they'll get around to that, but so in my cases, I'm going
to authorize payments from the CJA, not from the U.S. Attorneys'
funds.

Let me ask you this before we finish: In the 4246s, do you
ever have this Brady like issue arise where there's undisclosed
but exonerating information?

MS. PEARCE: In response to the question, your Honor, no.
What happens is when the certificate is filed, it is accompanied
by the report signed off by the team, consists of the

1  psychiatrist and the psychologist, which nomenclature would be

2  important here, traditionally, the Government has attached the

3  petition, I believe, that may be considered this Court's first

4  expert although it was prepared by BOP as the Government's

5  expert.

6      But in any event, the actual evaluation by BOP, 35 pages,

7  is attached to laying out why the full legal report for this

8  4246 petition.

9      THE COURT:  So it's not an adversarial process.  Is that

10 what you're saying?

11     MS PEARCE:  No, I'm not saying that.  That when the

12 Government goes to certify, they deliver a fully developed

13 psychiatric record.  Then the independent is selected by the

14 respondent and instructed to report following the guidelines set

15 forth in 4247, they get that report, they go out to Butner and

16 see the client and review the BOP records, and then that report

17 is submitted when it's complete.  Occasionally -- more often

18 than not, the independent tends to agree with that first

19 evaluation, but, unlike 4248, it's not to prepare a certificate.

20 It's a fully developed report.  And that's our position.

21     MR. ACKER:  And, your Honor, there have been different

22 periods of time when the BOP on 4248 cases have done the same

23 thing and has not done the same thing.  The statute doesn't

24 require it, and it's my understanding that perspectively and for

25 maybe the last year or so all new 4248 cases will also have that

1  full report.

2      THE COURT:  So the certificate will be much more thorough

3  and comprehensive.  Is that what you're saying?

4      MR. ACKER:  The certificate may or may not be, but it will

5  be accompanied by a -- it will be a full forensic evaluation

6  done.

7      THE COURT:  Which didn't happen in the 206 and 207 ones.

8      MR. ACKER:  I can't exactly be sure, but there was a period

9  of time, yes, your Honor, where that was not being done.

10      THE COURT:  Some of them were bare bones certifications

11  that were later supplemented.

12      MR. ACKER:  That is true.  So I think that I would agree

13  with Ms. Pearce that we don't think we have that problem in the

14  4246 cases, and hopefully, respectively, we won't have that in

15  the 4248 cases.

16      THE COURT:  And that's why we haven't had any litigation

17  happening.

18      MS. PEARCE:  That's correct, your Honor.

19      THE COURT:  So there's no case law on that.

20      MS. PEARCE:  There's no case law on that because it flows

21  in a very natural rhythm and for a -- it's a much shorter time

22  period.  Once that petition is filed with that accompanying

23  document, it allows us to contact the underlying criminal

24  attorneys with those records.  We can give all the materials

25  independent, and it's a much more streamlined process.

1       MR. ACKER:  And our hope also is, your Honor, again, we're

2   not there yet, but I hope that BOP's goal is eventually to get

3   to the point where it can certify these people six months prior

4   to their release so that all litigation or possible litigation

5   has taken place prior to the appearance of the cases.  The

6   nature of Congress in passing this and the Bureau of Prisons

7   having to rush different things, we're not there yet, as well as

8   the appellant litigation delaying it, but I think in the long

9   term, that'll be much more efficient.

10      THE COURT:  There's a certain issue on Comstock, too,

11  that's filed; is that right?

12      MR. ACKER:  That's correct.

13      MS. PEARCE:  Yes.

14      THE COURT:  Just recently filed?

15      MS. PEARCE:  Yes.  It was filed and, your Honor, to let you

16  know, the Government has filed a motion to extend the time to

17  respond.

18      THE COURT:  So the Government's awaiting a response before

19  they rule on its 24-hour cert.

20      MS. PEARCE:  The Government --

21      THE COURT:  The Government will have a response and then --

22      MS. PEARCE:  They've indicated they want more time --

23      THE COURT:  -- typically and then the petition will lay

24  over and either be granted or denied.

25      MR. ACKER:  And I believe -- I know the Public Defender is

1  not on the Timm's (ph) case, but I think that I heard that they
2  have also asked for a certified --
3      THE COURT:  As to a certain issue.
4      MR. ACKER:  Yeah.  I -- that's what I was told.  I haven't
5  seen it myself, your Honor.
6      THE COURT:  Who is representing Timms now, the same lawyers
7  that were in the District Court?
8      MR. ACKER:  I believe so, your Honor.  They represented him
9  in the 4th Circuit.
10     THE COURT:  All right.  Is there anything else we need to
11 touch on in this court case?  Ms. Little, you wanted to argue
12 about the costs?
13     MS. LITTLE:  I was going to argue the law, but if your
14 Honor already ruled -- that's a good reason not to --
15     THE COURT:  The law --
16     MR. ACKER:  Judge, Ms. Little and I are the estoppel
17 attorneys in the Hall matter which you had scheduled for trial
18 for I think it's May 9th right now and --
19     THE COURT:  No.  I reset it.  I saw your written documents.
20 I just set it for June 2nd or June 4th.
21     MS. LITTLE:  Your Honor, we filed a motion yesterday
22 requesting June 20th.
23     THE COURT:  I know.  I read that and I think I set it for
24 maybe June 6th.
25     MS. LITTLE:  Our problem, your Honor, is our experts are

1  not available.  The experts that are recorded experts for right
2  now --

3      THE COURT:  My problem is I'm not going to try it June the
4  20th.

5      MS. LITTLE:  June 20th is when all of our experts are --

6      THE COURT:  Yeah, but I'm not going to --

7      MS. LITTLE:  You're not available.

8      THE COURT:  I'm not going to do it then.

9      MS. LITTLE:  We have a problem in all of our experts are in
10  cases all over the country and to try and get --

11     THE COURT:  Yeah, but I set it for June 6th, and if that's
12  a problem, we can deal with it, but these things tend to work
13  themselves out.

14     MS. LITTLE:  Well, both the prosecutor and I thought if we
15  got together with our experts, got on calendar --

16     THE COURT:  I know, but I don't -- suppose the Court of
17  Appeals wanted to argue it next Monday.  You think you could
18  call them up and say, well, we're not all in agreement on that.

19     MS. LITTLE:  Well --

20     THE COURT:  They'd say no, you are in agreement.

21     MS. LITTLE:  That's true, your Honor.

22     THE COURT:  Well, let's just -- I'm not going to -- I'm not
23  going to do it on the week of the 20th, and I'm not going to set
24  it in July.  That sends a bad message.  I was looking for a time
25  to do it in April or May, and so that's the best you're going to

do.

    MR. ACKER:  Thank you, your Honor.

    MS. LITTLE:  Thank you.

    THE COURT:  It'll all work out.  Anything else?

    MR. ACKER:  No, your Honor.

    THE COURT:  Thank you all very much for coming back and sharing your thoughts.

    Take a brief recess and do the Defenders of Wildlife next.

    (The proceedings ended at 2:12 p.m.)

1

2                        CERTIFICATE

3      THIS IS TO CERTIFY THAT THE FOREGOING TRANSCRIPT OF

4  PROCEEDINGS TAKEN AT THE CIVIL SESSION OF UNITED STATES DISTRICT

5  COURT IS A TRUE AND ACCURATE TRANSCRIPTION TO THE BEST OF MY

6  ABILITY OF THE PROCEEDINGS TAKEN BY ME IN MACHINE SHORTHAND AND

7  TRANSCRIBED BY COMPUTER UNDER MY SUPERVISION.

8      THIS THE 13TH DAY OF APRIL, 2011.

9

10                            /S/ REBECCA L. CRUNK

11                        REBECCA L. CRUNK
                          COURT REPORTER
12

13

14

15

16

17

18

19

20

21

22

23

24

25